UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

LAFAYTIA HAIRSTON,

                     Plaintiff,                    Case No.: 12-cv-12640
                                            Honorable Avern Cohn
          v.                          Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                     Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 12]

Plaintiff Lafaytia Hairston ("Hairston") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 12] which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [2].

**I.     RECOMMENDATION**

For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") conclusion that Hairston was not disabled under the Act is supported by substantial evidence of record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [12] be GRANTED, that Hairston's Motion for Summary Judgment [8] be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.     **Procedural History**

On October 13, 2009, Hairston filed an application for DIB, alleging disability as of July 1, 2008.  (Tr. 108, 134).  The claim was denied initially on March 1, 2010.  (Tr. 38-39). Thereafter, Hairston filed a timely request for an administrative hearing (Tr. 4-7), which was held on February 8, 2011, before ALJ Elliott Bunce.  (Tr. 23).  Hairston, represented by attorney Mikel Lupisella, testified, as did vocational expert ("VE") Pauline McEachin.  (Tr. 23-37).  At the hearing, Hairston, through her counsel, requested to amend the onset date of her disability to her fiftieth birthday – February 19, 2009.  (Tr. 28, 33).  On February 24, 2011, the ALJ found Hairston not disabled.  (Tr. 9-22).  On May 22, 2012, the Appeals Council denied review.  (Tr. 1).  Hairston filed for judicial review of the final decision on June 18, 2012.  [1].

B.     **Background**

1.     *Disability Reports*

In a November 4, 2009 disability report, Hairston indicated that her ability to work is limited by "carpal tunnel [syndrome], restless leg syndrome[,] pain and numbness in hands; swelling [a]nd tingling; fingers lock up; cramping in elbow; shoulder pain[;] continued pain [in] legs."  (Tr. 112).  She indicated that these conditions limit her ability to work because they make it difficult for her to use her hands for anything, and the pain they cause keeps her up at night. (Tr. 112).  Hairston stated that she stopped working as an assembly worker in the automotive field due to these conditions on July 1, 2008.  (Tr. 112-13).  This prior job required her to use machines, tools, and equipment; to frequently carry items weighing up to 25 pounds; to walk for eight hours per day; to handle big objects and reach each for four hours per day; to crawl for three hours per day; to stoop and kneel each for two hours per day; and to climb for half an hour

2

each day.  (Tr. 113).  Hairston indicated that she has received treatment for these conditions, was administered an EMG in connection with them in 2009, and takes medication for her pain and her restless leg syndrome.  (Tr. 114-16).

In a December 1, 2009, function report, Hairston indicated that she lives by herself in an apartment.  (Tr. 126).  In terms of her daily activities, she reported that she cannot use her hands much because of pain and numbness, and her ability to care for herself is limited by the difficulties she has holding things and standing.  (Tr. 126-27).  She also indicated that the pain keeps her awake at night.  (Tr. 127).  She prepares "quick and easy" meals for herself on a daily basis, does light chores for short periods at a time, is able to drive and ride in a car, shops for groceries once or twice a month, visits with others occasionally, and goes to church regularly.  (Tr. 128-30).  Hairston reported that her conditions affect her ability to lift, squat, bend, stand, walk, sit, climb stairs, and use her hands.  (Tr. 131).

In a March 17, 2010, disability report, Hairston reported that her conditions had changed since her last report, listing severe pain in her hands, restless leg syndrome, and shoulder pain.  (Tr. 137).  She indicated that she was receiving treatment and taking medication for these conditions.  (Tr. 138-39).  She reported that her conditions do not affect her ability to care for her personal needs, and that no changes had occurred in her daily activities since completing her prior disability report.  (Tr. 140).

### 2.   *Plaintiff's Testimony*

At the hearing before the ALJ, Hairston testified that she was born February 19, 1959, is a high school graduate, and holds an associate's degree in child development.  (Tr. 28-29).  She had worked as an assembly worker in an automotive plant from March 1978 through July 2008, at which point she retired because she "could no longer deal with the pain."  (Tr. 29-30).

Hairston identified pain "in two places":  her right hand and in her back and legs.  (Tr. 30).  Hairston testified that she is right-handed and has pain in that hand every day, and that she has been diagnosed with carpal tunnel syndrome.  (Tr. 30-31).  Due to this, she can only lift five pounds with that hand and, if she has to lift something up, she has to use both hands.  (Tr. 31).  As to her legs and back, Hairston testified that she can walk for approximately ten to fifteen minutes on a level surface before she has to stop to take a break due to "tingling and pain going down [her] legs."  (Tr. 31).  Such pain and tingling also limits her ability to stand for longer than fifteen to twenty minutes, at which point she has to get off her feet and sit down.  (Tr. 31-32).  Hairston testified that she takes pain medication for her hand and her legs, and does not experience any side effects.  (Tr. 32).

As to her daily activities, Hairston testified that she spends "[p]retty much all day" sitting down in a chair and reclining her legs.  (Tr. 32).  She lives by herself, and does not get any help with household chores.  (Tr. 28, 32-33).  She does drive, but not every day and mostly locally.  (Tr. 29).  She has not worked since retiring from her position at the automotive plant.  (Tr. 29).

### 3.    Medical Evidence

#### a.    Treating Sources

##### i.    Dr. Paul LaClair

Hairston first saw Dr. Paul LaClair on October 7, 2009, for evaluation and treatment regarding her upper extremity complaints.  (Tr. 148).  Dr. LaClair noted that Hairston had been previously diagnosed with carpal tunnel syndrome and that she has had "ongoing right upper limb complaints, wrist pain, numbness and tingling primarily in digits 1, 2 and 3 of the hand and some cramping and locking of the fingers," symptoms which "increase with physical activity."  (Tr. 148).  He further noted that Hairston occasionally has some neck pain, denies having

4

shoulder pain, and has milder symptoms on her left side which do not bother her significantly. (Tr. 148). He indicated that Hairston wears a wrist splint at night, has not yet been treated with Neurontin, and would consider surgical intervention if she is found to have ongoing carpal tunnel syndrome. (Tr. 148). Dr. LaClair's physical examination revealed normal cervical range of motion, no signs of shoulder impingement bilaterally, normal tone, no atrophy in the upper limbs, negative Finkelstein's test results bilaterally, and no significant arthritic deformity in her hands. (Tr. 148-49). He observed that Hairston's Tinel's test was positive over the median nerve of the right wrist and equivocal over the median nerve of the left wrist; that there was no tenderness over either cubital tunnel; and that her intrinsic hand strength, abductor pollicis brevis strength, and anterior interosseous nerve function were intact. (Tr. 149). Dr. LaClair concluded that Hairston's symptoms were "most compatible with carpal tunnel syndrome," and recommended an EMG of Hairston's upper limbs, a trial prescription of Neorontin, and continued use of a wrist splint at night. (Tr. 149).

Dr. LaClair next saw Hairston on November 10, 2009, for electrodiagnostic testing, which included an EMG of her upper right limb and sensory and motor nerve conductions on both upper limbs. (Tr. 145). Dr. LaClair noted that Hairston had been taking Neurontin at night and found it helpful. (Tr. 145). The electrodiagnostic testing revealed a mild to moderate median neuropathy consistent with carpal tunnel syndrome, and no other peripheral nervous system pathology in Hairston's upper limbs. (Tr. 145). Dr. LaClair found no evidence of motor axonal degeneration associated with right carpal tunnel syndrome. (Tr. 145). Dr. LaClair concluded that Hairston "can simply monitor the carpal tunnel syndrome," gave her a refill of Neurontin, advised that she continue to wear the wrist splint at night, and indicated that he would see her for a follow-up visit in three months. (Tr. 145). There is no record of any further

5

treatment with Dr. LaClair.

### ii.     Dr. Josetta Tharippeal

Hairston's first recorded visit with Dr. Josetta Tharippeal occurred on November 3, 2009. (Tr. 143).  Dr. Tharippeal's progress notes indicate that Hairston was scheduled to see her in January 2009, but cancelled; on May 13, 2009, Dr. Tharippeal's office contacted Hairston to schedule a follow-up appointment, which was set for June 2009 but which Hairston also did not attend.  (Tr. 143).  Dr. Tharippeal's office left a message for Hairston at that time, and again in October 2009, to reschedule her appointment, which Hairston eventually did.  (Tr. 143).  Per Dr. Tharippeal's notes, at the November 3 appointment, Hairston complained of burning pain in her legs, and indicated that her prescribed Ropinirole and C-PAP machine were providing some help to her.  (Tr. 143).  Hairston also indicated that she was "trying to apply for disability."  (Tr. 143). Dr. Tharippeal assessed Hairston with leg pain and possible restless leg syndrome, sleep apnea, and leukopenia; referred her to Dr. Nael Tarakji, a neurologist; and advised that she return for a physical.  (Tr. 143, 158).

### iii.     Dr. Nael Tarakji

On the referral of Dr. Tharippeal, Hairston was evaluated by Dr. Nael Tarakji on December 1, 2009.  (Tr. 158).  Dr. Tarakji noted that Hairston's chief complaints were numbness and a burning sensation involving both feet with some back pain radiating to the hip and lower extremities, resulting in cramps with no weakness; and numbness and tingling involving both hands, moreso on the right than the left.  (Tr. 158).  Dr. Tarakji's examination revealed normal tone, bulk, and muscle strength of all muscle groups; normal gait; and grossly intact sensation. (Tr. 158).  Hairston's Tinel and Phalen signs were positive bilaterally.  (Tr. 158).  Dr. Tarakji performed a lower-extremity EMG, which was "mildly abnormal," revealing "L5/S1 root

6

irritation without evidence of sustained denervation, which could be consistent with degenerative lumbar spine disease with possible neural foraminal narrowing." (Tr. 160). Dr. Tarakji diagnosed Hairston with degenerative lumbar spine disease causing neural foraminal narrowing, and bilateral carpal tunnel syndrome. (Tr. 158). He recommended an adjustment to Hairston's prescription for Neurotonin, an additional prescription for Pamelor, an MRI of Hairston's lumbosacral spine for further evaluation, a blood screen for neuropathy, and a follow-up visit in two months. (Tr. 159). An MRI was then performed, revealing mild disc herniations at the L4-L5 and L5-S1 levels in the midline, without any evidence of spinal stenosis; a mild left lateral herniation of disc in the anteroinferior aspect of the left L4 neural foramen; a mild herniation of disc in the right L4 neural foramen without compromise of exiting nerve roots; and normal lumbar lordosis and preservation of normal lumbar alignment. (Tr. 154-55). The record reflects no further visits with Dr. Tarakji, or further treatment for Hairston's legs and back.

#### iv. *Dr. Ahmed Arif*

Hairston saw Dr. Ahmed Arif on June 2, 2010, complaining of numbness associated with pain in her right hand and wrist which worsens with repetitive movements. (Tr. 189). Dr. Arif diagnosed Hairston with carpal tunnel syndrome on her right side, recommended that she continue to use a wrist splint at night, and indicated that, if the condition worsens, he would refer her to surgery. (Tr. 189). Dr. Arif also noted that Hairston was seeing him for follow-up regarding her sleep apnea: Dr. Arif observed no problems with her throat, chest, heart, or abdomen; Hairston indicated that she had been using a C-PAP machine, which had been making her feel better; and Dr. Arif recommended continued use of the machine and encouraged weight loss. (Tr. 189).

>    b.      *Consultative and Non-Examining Sources*

On January 10, 2010, state agency medical consultant Dr. R.H. Digby completed physical residual functional capacity assessments of Hairston. Dr. Digby offered a primary diagnosis of carpal tunnel syndrome, and observed that Hairston: could occasionally lift and/or carry 100 pounds or more, frequently lift and/or carry 50 pounds or more, stand and/or walk about six hours in an 8-hour workday, and sit with normal breaks for about six hours in an eight-hour workday; was limited in her ability to push and/or pull with her upper extremities; had no postural, visual, or communicative limitations; could engage in frequent but not constant bilateral fingering and handling; and should avoid moderate exposure to hand vibration (e.g., hand power tools). (Tr. 173-77). Dr. Digby concluded that Hairston's symptoms of pain could reasonably result from her medically determinable impairments, but the medical evidence did not support the severe functional limitations that Hairston claimed. (Tr. 178).

On February 25, 2010, Dr. Digby completed a second physical residual functional capacity assessment of Hairston. He offered a primary diagnosis of degenerative disc disease of the lumbar spine and a secondary diagnosis of carpal tunnel syndrome, and listed restless leg syndrome and shoulder pain as other alleged impairments. (Tr. 181). He observed that Hairston: could occasionally lift and/or carry 20 pounds or more, frequently lift and/or carry 10 pounds or more, stand and/or walk about six hours in an 8-hour workday, and sit with normal breaks for about six hours in an eight-hour workday; was limited in her ability to push and/or pull with her upper and lower extremities; could occasionally engage in postural activities (i.e., climbing, balancing, stooping, kneeling, crouching, and crawling); had no visual or communicative limitations; could engage in frequent but not constant bilateral fingering and handling; and should avoid moderate exposure to hand vibration (e.g., hand power tools) and concentrated

exposure to hazards (e.g., machinery and heights).  (Tr. 182-85).  Dr. Digby again concluded that Hairston's symptoms of pain could reasonably result from her medically determinable impairments, but the medical evidence did not support the severe functional limitations that Hairston claimed.  (Tr. 186).

### 4. Vocational Expert's Testimony

At the hearing before the ALJ, the Vocational Expert testified regarding a hypothetical individual of Hairston's age, education, and work history who is able to perform work that does not require (1) exertion above the light exertional level, (2) more than occasional fingering, (3) more than occasional climbing, stooping, kneeling, crouching, or crawling, or (4) more than occasional pushing and pulling with the arms.  (Tr. 34-36).  The VE identified the following unskilled entry-level occupations that such an individual could perform:  security guard, information clerk, and identification clerk.  (Tr. 35).  The VE also confirmed that none of these occupations would generally involve any exposure to poor ventilation or extremes of dust, humidity, and temperature.  (Tr. 36).

### C.    Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity,

benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.   The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Hairston not disabled under the Act.  The ALJ first found that Hairston met the insured status requirements of the Act through December 31, 2014, and had not engaged in substantial gainful activity since July 1, 2008.  (Tr. 14).  At Step Two of the analysis, the ALJ found that Hairston had the following severe impairments:  carpal tunnel syndrome and degenerative disc disease.  (Tr. 14).  At Step Three, the ALJ found that Hairston's impairments, considered alone or in combination, did not meet or medically equal any of the applicable listed impairments in the regulations.  (Tr. 14).

The ALJ then assessed Hairston's residual functional capacity ("RFC"), concluding that she is capable of performing work that does not require: exertion above the light level; more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; more than occasional fine dexterity; or more than occasional pushing or pulling with the arms. (Tr. 15-17).

At Step Four, the ALJ determined that Hairston is unable to perform her past relevant work as an automotive assembler because such work requires medium exertion, thereby exceeding her RFC. (Tr. 17). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Hairston is capable of performing a significant number of jobs that exist in the national economy. (Tr. 18). Accordingly, the ALJ concluded that Hairston is not disabled under the Act. (Tr. 18-19).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (quotation marks omitted); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007) (quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

**F.    Analysis**

Hairston challenges the ALJ's assessment of her residual functional capacity, and his consequent conclusion that she is able to perform work that exists in significant numbers in the national economy.  According to Hairston, she "cannot perform this work that exists in significant numbers because of her restrictions."  [8 at 7].  This court, however, sees no error in

the ALJ's analysis, and finds his determination supported by substantial evidence.

As Hairston notes, the Regulations define "light work" to

involve[] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).  According to Hairston, "[t]he above definition clearly states that [she] must be 'capable of performing a full or wide range of light work' and 'have the ability to do substantially *all*' of it," but due to her conditions, she cannot.  [8 at 9].  Namely, Hairston contends that: (1) "[s]he cannot perform a seated position because these entail 'some' pushing and pulling, which results in physical pain for" her; (2) "[s]he is also not capable of a standing or walking position because she is not able to stoop, kneel, crouch, or carry up to twenty (20) pounds, or frequently carry up to ten (10) pounds"; and (3) because "[t]he effects of Carpal Tunnel Syndrome can be drastic, including weakness in the hand" which "may even lead to paralysis if the problem is not corrected," "[t]he possibility of the pain returning, or worse, paralysis of the hand, hinders [her] ability to perform 'substantially all' or a 'wide range of light work.'"  [8 at 9-10].

These arguments miss the mark.  First, the ALJ did not conclude that Hairston had the RFC to perform "a full or wide range of light work"; rather, he limited her to work that does not require "exertion above the light level" and then imposed further restrictions.  (Tr. 15-17).[1]

---

[1] Hairston notes that the "CFR doesn't define 'light work' as 'occasional,' but rather, merely 'some' pushing or pulling" and that "[u]sing this correct terminology, [she] is not capable of performing 'light' level work."  [8 at 9].  Hairston provides no further explanation or support for this argument, but appears to suggest that, by limiting Hairston to no "more than occasional pushing and pulling with her arms," the ALJ exceeded the limitation that she not perform work requiring "exertion above the light level."  The court, however, sees no such discrepancy here. *See, e.g.*, *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) (noting that "light work"

13

Second, while Hairston asserts that her conditions prohibit her from performing the work provided by the ALJ's RFC, she cites to no record evidence in support; indeed, as the Commissioner observes, "not one of [Hairston]'s physicians indicated any long-term or permanent functional limitations resulting from her impairments that would preclude her from performing light work within the parameters of the ALJ's residual functional capacity finding." [12 at 6-7].

The ALJ's RFC, by contrast, is well supported by substantial evidence.  For instance, Hairston states that pushing and pulling cause her physical pain, but nothing in the record indicates that she cannot perform these activities occasionally with her arms, as provided by the ALJ's RFC.  Instead, as the ALJ noted, Hairston had only three doctor's visits regarding her upper extremity pain, underwent electrodiagnostic testing which revealed mild to moderate median neuropathy at her right wrist consistent with carpal tunnel syndrome and no other pathology, and received conservative treatment – medication and a wrist splint.  (Tr. 15, 148-49, 145, 189).[2]  *See* S.S.R. 96–7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . ."); *Jennings v. Comm'r of Soc. Sec.*, No. 10-12830, 2011 WL 7025815, at *7 (E.D. Mich. Oct. 31, 2011) (ALJ properly considered conservative nature of claimant's treatment in discrediting his testimony regarding the intensity, persistence and limiting effects of his pain); *cf. Seay v. Comm'r of Soc. Sec.*, No. 11-12252, 2012 WL 3759027, at *6 (E.D. Mich., Aug. 6, 2012) (ALJ properly considered claimant's conservative courses of treatment for both psychological and physical conditions in evaluating weight to afford treating sources' opinions).  Correspondingly, the state agency

---

involves "the occasional pushing and pulling of arm or leg controls"); *cf.* S.S.R. 83-10 ("'Occasionally' means occurring from very little up to one-third of the time.").

[2] Dr. Tarakji also noted Hairston's carpal tunnel syndrome, and adjusted her medication, during his evaluation of her back and leg pain on Dr. Tharippeal's referral.  (Tr. 158-59).

physician, Dr. Digby, found that Hairston could push and pull on a limited basis and could engage in frequent bilateral handling and fingering.  (Tr. 16, 182-84).

Hairston now raises general concerns that her carpal tunnel syndrome could get worse and possibly lead to paralysis, but there is nothing in the record to substantiate this "potential effect" [8 at 10] as to Hairston, or elevate it beyond mere speculation; if anything, her unexplained failure to follow up with Dr. LaClair or Dr. Arif after those doctors had suggested she do so belies any such real concern on Hairston's part.  (Tr. 15 ("[Hairston] had no follow up care after [a June 2010] visit [with Dr. Arif]"), 145 (Dr. LaClair noting that "I will see her in follow up in three months"), 189 (Dr. Arif noting that "[i]f condition worsens, will refer to surgery")).  *See, e.g.*, S.S.R. 96–7p; *Gilbert v. Comm'r of Soc. Sec.*, No. 10-11331, 2011 WL 3840212, at *3 (E.D. Mich., Aug. 2, 2011) ("The fact that Plaintiff did not seek additional treatment from specialists for her shoulders after December 2006, suggests that the condition had improved and she was no longer experiencing severe joint pain."); *Seay*, 2012 WL 3759027 at *6 (ALJ properly afforded little weight to treating source's opinion of psychological disability because, *inter alia*, claimant "did not receive other mental health treatment [beyond one psychiatrist's visit and over-the-counter medication] even though he was referred to a community mental health program to accommodate the fact that he did not have insurance").  Moreover, the issue before the ALJ is whether Hairston was disabled during the relevant time period being considered by the ALJ – *i.e.*, the alleged onset date through the date of the ALJ's decision (or Hairston's last insured date) – not whether she might, on some unidentifiable future date, become disabled.  *See Thompson v. Comm'r of Soc. Sec.*, No. 10-995, 2012 WL 910048, at *8 (W.D. Mich., Mar. 15, 2012) (claimant's additional evidence was not material because it did not reflect claimant's condition during this relevant time period).

Similarly, Hairston identifies no support for her claim that she cannot stoop, kneel, crouch, carry up to twenty pounds, or frequently carry up to ten pounds.  Dr. Digby, on the other hand, found she could lift and carry these amounts and could occasionally engage in these postural activities (Tr. 182-83), and the medical evidence again supports this assessment:  as the ALJ observed, an EMG of Hairston's lower extremities was only mildly abnormal (Tr. 160); a subsequent MRI of her lumbar spine revealed only mild herniations, with normal lumber lordosis and alignment and no evidence of spinal stenosis (Tr. 154-55); and the course of treatment for her back, like that for her carpal tunnel syndrome, was correspondingly "rare" and "essentially routine and conservative in nature," comprising only two doctor's visits (the first visit coming approximately eight months after her amended onset date and only upon the repeated urging of Dr. Tharippeal's office) and treatment with medication.  (Tr. 16, 143, 158-60).

Hairston does not challenge any particular aspect of the ALJ's evaluation of the record, or of his assessment that, upon thorough review of the medical evidence and opinions, Hairston's treatment history, and her daily activities, her "statements concerning the intensity, persistence, and limiting effects" of her conditions were not fully credible.  (Tr. 15-17).  Instead, Hairston simply disagrees with the ALJ's conclusion that she possessed a certain RFC.  The relevant inquiry, however, is not whether Hairston (or even this court) agrees with the ALJ's decision, but whether that decision is supported by substantial evidence and based on the correct legal standards.  *See, e.g.*, *Longworth*, 402 F.3d at 595; *Cutlip*, 25 F.3d at 286.  Hairston has not identified any basis to conclude that the ALJ's decision was lacking in either regard.  Nor does the court, upon its full review of the ALJ's decision and the record evidence, find any such basis.  Accordingly, this court recommends that the ALJ's decision be affirmed.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Hairston's Motion for Summary Judgment [8] be DENIED, the Commissioner's Motion for Summary Judgment [12] be GRANTED, and this case be AFFIRMED.

Dated: April 2, 2013                                s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                           United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 2, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager